**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN AND JANE DOES, in their own right and as parents and natural guardians of L. Doe, a minor,** | : | |
| | : | |
| | : | |
| | : | |
| **and** | : | |
| | : | |
| **WILLIAM AND MARY ROE, in their own right and as parents and natural guardians of A. Roe, a minor,** | : | |
| | : | |
| | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 15-901** |
| | : | |
| **SOUTHEAST DELCO SCHOOL DISTRICT et al.** | : | |

_____

| | | |
|---|---|---|
| **JOHN AND JANE DOES, in their own right and as parents and natural guardians of L. Doe, a minor, et al.** | : | |
| | : | |
| | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 15-3655** |
| | : | |
| **SOUTHEAST DELCO SCHOOL DISTRICT et al.** | : | |
| | : | |

_____

| | | |
|---|---|---|
| **MARTHA POE, in her own right and as parent and natural guardian of S. Poe a minor** | : | |
| | : | |
| | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 15-2369** |
| | : | |
| **SOUTHEAST DELCO SCHOOL DISTRICT et al.** | : | |

_____

**JOHN AND JANE DOES, in their own right**    :
**and as parents and natural guardians of L. Doe,**  :
**a minor**    :
   :
   **v.**    :       **CIVIL ACTION NO. 16-1364**
   :
**SOUTHEAST DELCO ELEMENTARY**    :
**SCHOOL et al.**    :
_____

**MCHUGH, J.**                                      **SEPTEMBER 27, 2017**

<u>**MEMORANDUM**</u>

**Table of Contents**

I. Factual Overview ........................................................................................................1

II. Standard of Review ...................................................................................................4

III. Discussion ....................................................................................................................4

   A. Plaintiffs' § 1983 Claims..................................................................................4

      1. Permissibility of Parallel Claims Under Title IX and § 1983...................5

      2. Municipal Liability Claims Under *Monell* ................................................9

         a. Controlling Legal Principles ...........................................................10

         b. The Specific *Monell* Claims ..........................................................12

            i. *Failure to Investigate* ...............................................................12

               A. The B.F. Investigation.....................................................12

               B. The Poe Investigation .....................................................16

            ii. *Failure to Train*.......................................................................23

            iii. *Failure to Screen* ...................................................................29

      3. State-Created Danger Claims ...................................................................33

         a. Elements of a State-Created Danger Claim .....................................35

         b. Application of Controlling Principles ..............................................35

            i. *Affirmative State Action that Causes Harm* ............................35

            ii. *Culpability that Shocks the Conscience* ..................................37

            iii. *Foreseeable and Fairly Direct Connection Between Action and Harm*..........40

            iv. *Discreet Class of Victims*........................................................42

         c. Qualified Immunity..........................................................................43

   B. Title IX Claims ...............................................................................................45

IV. Conclusion ...............................................................................................................49

These consolidated cases arise out of sexual abuse perpetrated by Paul Hochschwender during his tenure as a teacher at the Darby Township School.  In 2014, Hochschwender was arrested and charged with indecent assault, institutional sexual assault, and corruption of minors involving conduct that occurred in 2013 and 2014.  He pled *nolo contendere*, registered as a sex offender, and served a prison sentence.  Plaintiffs, who were student victims of Hochschwender's abuse, now seek to recover monetary damages from the Southeast Delco School District and various administrators who worked at the Darby Township School.  Because, with the exception of Hochschwender, Defendant Southeast Delco School District and its employees are immune under state law, Plaintiffs must seek compensation by navigating the maze of federal civil rights law.  Discovery is complete, and motions for summary judgment are now before me.  For the reasons that follow, the motions will be granted in part and denied in part.

## I. Factual Overview

The record in these cases is voluminous, with multiple factual disputes.  Because disposition of these motions requires a nuanced analysis of specific facts in the context of each claim for relief, it is more practical to begin with an overview, and address the details as they are pertinent to the legal theories advanced.

Paul Hochschwender became an elementary school teacher at Radnor Township School in 1993, and worked there until 2000, when police investigated him for sexually abusing children.  The investigation resulted in no charges against Hochschwender.  He returned to teaching briefly, but then resigned for "medical reasons," including stress caused by the investigation.

Hochschwender first began working in the Southeast Delco School District, at Darby Township School, in 2003 as an occasional substitute teacher, following interim employment at a

literacy program. In 2006, he was hired as a long-term substitute at Darby, and in January 2007, he was hired as a full-time fifth-grade teacher. He cleared both criminal background and child abuse checks at the time.

Two earlier incidents of abuse at Darby serve as the backbone of Plaintiffs' cases. The first occurred in 2007, when a student named B.F.[1] told a guidance counselor that Hochschwender put her hands in his lap (near, but not touching, his penis) and held them there for ten seconds. The second incident occurred in 2011, and involved Plaintiff S. Poe. Poe reported to her father that Hochschwender at one point "patted" her on the bottom when she asked to go to the restroom. Poe's father then gathered information about conduct involving other girls and presented it to the school principal.

For the most part, the parties agree about what occurred after B.F.'s 2007 allegation, and the dispute centers on the adequacy of the investigation, and whether B.F. retracted her accusations or was coerced into doing so. There is far more conflict in the record about the investigation that followed Poe's 2011 claims. Suffice it to say that there is testimony supporting two starkly different accounts: one where the principal conducted a full, but possibly flawed, investigation into Hochschwender's conduct, and the other where the principal simply did not conduct an investigation at all.

Plaintiffs claim that the school administrators' response to these two incidents, or lack thereof, gives rise to liability under § 1983 and Title IX. They argue under various theories that administrators at Darby failed to protect them by not properly screening Hochschwender before hiring him, failing to have in place adequate policies, failing to train administrators to investigate

---

[1] B.F. is not a party to this suit.

sex abuse, and failing properly to investigate B.F.'s and Poe's complaints of misconduct.  (Poe herself is also a plaintiff in this case and makes the same claims.)

In addition to suing the District, Plaintiffs have brought claims against the following individuals:

- Paul Hochschwender;

- Michael A. P. Jordan, principal of Darby during the Poe incident and investigation;

- Jeffrey Ryan, assistant superintendent of the District during both the B.F. and Poe incidents; and

- Stephen D. Butz, who became superintendent of the District after the B.F. incident and held that position at the time of the Poe incident.[2]

Plaintiffs have not brought claims against the following individuals, but they figure prominently in the record:

- Jeannine Bristow, Darby's guidance counselor during both the B.F. and Poe incidents;

- Mary Dunwoody, Darby's principal during the B.F. incident, who left before the Poe incident;

- Ashwina Mosakowski, an assistant principal at Darby at the time of the Poe incident who later became principal; and

- Trudy Bennett, superintendent at the time of the B.F. incident.

---

[2] Although Butz is an individually named defendant, he is sued in his official capacity. The claim against him is therefore treated as a claim against the District.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

## II.  Standard of Review

This motion is governed by the familiar standard set out in Federal Rule of Civil Procedure 56.  "To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *Pearson v. Prison Health Serv.*, 850 F.3d 526, 533 (3d Cir. 2017).  All reasonable inferences should be drawn "in the light most favorable to the nonmovant."  *Id.*  A fact is only material if it "could affect the outcome" of the proceeding, and a dispute over a material fact is only genuine if the evidence is "sufficient to permit a reasonable jury to return a verdict for the non-moving party."  *Id.* at 534.

## III. Discussion

With that broad framework providing some orientation, I address Plaintiffs' specific claims and the sufficiency of the evidence for each.

### A.  Plaintiffs' § 1983 Claims

Plaintiffs seek relief under 42 U.S.C. § 1983.  To prevail, they must show that Defendants "acted under the color of state law and denied [them] a federally protected constitutional or statutory right."  *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 277 (3d Cir. 1999).  For purposes of this motion, Defendants do not dispute that, at all relevant times, they acted under color of state law.  And they concede that Hochschwender's abuse of plaintiffs Poe, Roe, and the three Does deprived those children of their substantive due process right to bodily integrity.  Nevertheless, Defendants disclaim any liability for Hochschwender's actions.

Plaintiffs' § 1983 claims fall into two broad categories: municipal liability claims against the District,[3] and state-created danger claims against Assistant Superintendent Ryan and Principal Jordan in their personal capacities. Preliminarily, however, I must consider whether such claims are precluded under Title IX of the Education Amendments of 1972 to the Civil Rights Act, 20 U.S.C. §§ 1681–1688, commonly known just as Title IX.

### 1. Permissibility of Parallel Claims Under Title IX and § 1983

At oral argument, the District for the first time contended that Plaintiffs' § 1983 claims are precluded by the existence of their parallel Title IX claims, citing several cases. Tr. of Oral Arg. 10:20–12:3 (citing *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791 (3d Cir. 2007); *Bruneau ex rel. Schofield v. S. Kortright Cent. Sch. Dist.*, 163 F.3d 749 (2d Cir. 1998); *Schengrund v. Pa. State Univ.*, No. 4:07-CV-718, 2009 WL 82510 (M.D. Pa. Jan. 12, 2009); *M.S. ex rel. N.S. v. Twin Valley Sch. Dist.*, No. 2:15-CV-05733 (E.D. Pa. June 14, 2016)). Notably, defense counsel did not so much as mention the Supreme Court's decision in *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246 (2009). I found this omission troublesome, as three of the four cases cited by counsel predated *Fitzgerald*, and the fourth did not address it. In *Fitzgerald*, the Court unanimously held that "Title IX was not meant to be . . . a substitute for § 1983 suits as a means of enforcing constitutional rights," with the result that "§ 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools." *Id.* at 258. Following argument, therefore, I asked the parties to address the import of *Fitzgerald* for this case.

*Fitzgerald* involved a kindergartener who claimed her classmates had regularly sexually

---

[3] Because Plaintiffs' claims against the District are based on the theory of municipal liability recognized in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), I refer to them collectively as *Monell* claims.

harassed her, and sued the school district under both Title IX and § 1983. *Id.* at 249. Her § 1983 claims were premised on violations of both federal law (Title IX) and the Constitution (the Equal Protection Clause). *Id.* at 250. The lower courts dismissed both § 1983 claims as precluded by Title IX. But as to the equal-protection claim, the Supreme Court reversed, holding that Title IX does not bar parallel § 1983 claims under the Equal Protection Clause. *Id.* at 258.

*Fitzgerald* specifically addressed § 1983 claims based on the Equal Protection Clause, but the Court's reasoning largely did not distinguish between different types of constitutional claims. The Court began by recognizing that whenever the question is whether a federal statute precludes a parallel § 1983 claim, the key consideration is congressional intent. *Id.* at 252–53. And "[i]n cases in which the § 1983 claim alleges a constitutional violation," the Court explained, "lack of congressional intent may be inferred from a comparison of the rights and protections of the statute and those existing under the Constitution." *Id.* at 252. Regardless of whether the § 1983 claim is constitutional or statutory, however, the Court placed primary emphasis on the nature and extent of the potentially preclusive statute's remedial scheme. *See id.*

Applying that framework, the Court acknowledged three prior instances where it had found that Congress had intended to preclude parallel § 1983 claims: the Federal Water Pollution Control Act and Marine Protection, Research, and Sanctuaries Act of 1972, *see Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981); the Education of the Handicapped Act, *see Smith v. Robinson*, 468 U.S. 992 (1984); and the Telecommunications Act of 1996, *see Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005). But the *Fitzgerald* Court found Title IX to be different. First, unlike the "'unusually elaborate,' 'carefully tailored,' and 'restrictive' enforcement schemes of the statutes at issue in *Sea*

*Clammers*, *Smith*, and *Rancho Palos Verdes*," "Title IX has no administrative exhaustion requirement and no notice provisions." 555 U.S. at 255. What's more, Title IX has only one express enforcement mechanism (a funding-withdrawal provision), and the statute's only other remedy is an implied right of action—a significant point, given that the "Court has never held that an implied right of action had the effect of precluding suit under § 1983." *Id.* at 255–56. And finally, the Court found it significant that Title IX and § 1983 are not perfectly congruous in their coverage. *Id.* at 256–57. In all, the Court reasoned, in the Title IX context, "parallel and concurrent § 1983 claims will neither circumvent required procedures, nor allow access to new remedies," *id.* at 255–56, and so the most tenable conclusion is that "Congress did not intend Title IX to preclude § 1983 constitutional suits," *id.* at 256.

Turning back to this case, the School District argues that *Fitzgerald*'s holding does not squarely resolve whether Plaintiffs' § 1983 claims are precluded by their parallel Title IX claims. That might be true in a strictly literal sense, but the District's formulaic argument is hollow in the absence of any reason why a § 1983 claim predicated on a violation of due process differs in any meaningful way from one rooted in equal protection. In its supplemental briefing, the District now further argues that *Fitzgerald* is of no relevance, because it did not involve a § 1983 claim predicated on a violation of Title IX. *See* No. 15-2369, Dkt. 80 at 3–4 (citing *Wilkerson v. Univ. of N. Tex.*, No. 4:15-CV-00540 (E.D. Tex. Nov. 30, 2016); *Doe v. Town of Stoughton*, 917 F. Supp. 2d 160 (D. Mass. 2013)). This argument fails because none of Plaintiffs' §1983 claims here is predicated on a violation of Title IX. As Plaintiffs correctly observe (No. 15-2369, Dkt. 81 at 2–3), their § 1983 claims are constitutional ones: (1) their *Monell* claims are based on an underlying "constitutional right . . . to freedom from invasion . . . of personal security through sexual abuse," *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 770, 726 (3d

Cir. 1989);[4] and (2) their state-created danger claims are similarly grounded in the Fourteenth Amendment's Due Process Clause, *see Sanford v. Stiles*, 456 F.3d 298, 303–04 (3d Cir. 2006). *Fitzgerald* quite plainly reasoned that "Congress did not intend Title IX to preclude § 1983 constitutional suits." *Id.* at 256.

Returning to the cases on which the District relies, none is persuasive. Most involved § 1983 claims based on statutes, not constitutional violations.[5] *A.W.*, the leading Third Circuit case on congressional preclusion of § 1983 actions, was decided before *Fitzgerald*, and addressed a claim rooted in violations of the Individuals with Disabilities Education Act and the

---

[4] Plaintiffs' *Monell* claims were initially predicated on violations of both "Constitutional and federally protected statutory rights," *e.g.*, No. 15-2369, Compl. ¶ 37, with the statutory rights presumably deriving from Title IX. At the motion-to-dismiss stage, however, Plaintiffs appeared to clarify that their *Monell* claims are based solely on violations of Plaintiffs' constitutional rights. *E.g.*, No. 15-2369, Dkt. 16-1 at 5–8. And I do not read Plaintiffs' briefing on summary judgment to alter that position.

[5] While I need not decide whether a § 1983 claim based on a violation of Title IX is barred by Title IX, I see little in *Fitzgerald* that would clearly bar a plaintiff from maintaining a parallel *Monell* claim against a school district which receives federal funds.

The *Fitzgerald* Court's discussion of precedent where claims were barred focused entirely on the specifics of the statutes involved, with no mention of any conceptual distinction between a § 1983 suit based on a statute and one based on the Constitution.

The Court distinguished Title IX from the statutes in prior cases on the grounds that Title IX has no exhaustion or notice requirements. Title IX plaintiffs "can file directly in court, and can obtain the full range of remedies," 555 U.S. at 255, with the result that "parallel and concurrent § 1983 claims will neither circumvent required procedures, nor allow access to new remedies." *Id.* at 255–56.

The Court defined the question to be whether Congress intended to preclude a claim because it had otherwise enacted a "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." 555 U.S at 252–53. Ultimately, it gave near dispositive weight to Title IX's lack of such a comprehensive enforcement scheme. *Id.* at 255–56.

If a § 1983 claim rooted in Title IX is brought against an individual educator, there is a valid concern that it might constitute an attempt to bypass Title IX's explicit limitation of liability to recipients of federal funds. *Doe v. Sch. Bd.*, 604 F.3d 1248, 1266 n.12 (11th Cir. 2010). A similar concern does not exist with *Monell* claims.

Rehabilitation Act. 486 F.3d at 802–06.[6] And *M.S.*, *Doe*, and *Wilkerson* all involved attempts to use § 1983 to sue for violations of Title IX rather than the Constitution. *See* No. 2:15-cv-05733 (E.D. Pa. June 14, 2016), slip op. 21–22; 917 F. Supp. 2d at 163–66; No. 4:15-CV-00540 (E.D. Tex. Nov. 30, 2016), slip op. 18–20. In contrast, Plaintiffs' § 1983 claims all sound in the Fourteenth Amendment. Insofar as the School District otherwise invokes cases where courts dismissed § 1983 claims asserting constitutional violations as precluded by Title IX, those cases—*Bruneau*, 163 F.3d at 757–59, and *Schengrund*, 2009 WL 82510, at *3—predated *Fitzgerald* and were in my view necessarily abrogated by it. In fact, *certiorari* was granted in *Fitzgerald* to resolve a split among the circuits, and the line of cases represented by *Bruneau* was ultimately repudiated by *Fitzgerald* itself. *See* 555 U.S. at 251.

I therefore conclude that Plaintiffs' § 1983 claims are not barred by Title IX.

### 2. Municipal Liability Claims Under *Monell*

Plaintiffs advance three sets of *Monell* claims against the District. First, they allege that the District failed to investigate credible allegations of child abuse. Second, they allege that the District failed to train its administrators how to properly conduct such investigations. And third, they allege that the District failed to adequately screen its employees for past child abuse.

All of these claims fail as a matter of law. As to the investigation claim, Plaintiffs cannot establish liability because any investigative missteps by District personnel either did not evince the requisite degree of culpability—deliberate indifference—or were not attributable to a policy or custom of the District. As to the training claims, Plaintiffs cannot establish liability because they cannot show that the District caused them harm by failing to train its staff to investigate

---

[6] I do not see the recently issued decision in *Williams v. Pennsylvania Human Relations Commission*, ___ F.3d ___, No. 16-4383, 2017 WL 3725011 (3d Cir. Aug. 30, 2017), as affecting this analysis, because that case emphasized the procedural requirements for the plaintiff's parallel ADA and Title VII claims.

abuse allegations.  And as to the failure to screen, Plaintiffs cannot show that the District acted with deliberate indifference in failing to thoroughly review Hochschwender's prior work history.

The framework for municipal liability is set forth first, followed by an analysis of each set of claims.

        a.   <u>Controlling Legal Principles</u>

It is a basic principle of the law as it has evolved under §1983 that local governments—which for these purposes include the District—are not vicariously liable for the unconstitutional acts of their employees.  Rather, "under § 1983, local governments are responsible only for their *own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citation omitted).  Consequently, it is only "when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

"Policy is made when a decision maker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict.  A course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well settled as to virtually constitute law." *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996) (citations omitted).

"[I]t is not enough," however, "for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).  To do this, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability." *Id.*  Unless the policy or custom at issue is a facial violation of federal law, the culpability standard is "deliberate indifference . . . to [the] known or obvious consequences" of municipal action or inaction. *Berg*

*v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (citations omitted). "A showing of simple or even heightened negligence will not suffice." *Id.* In all cases, the government actor will be liable only if there is an "affirmative link between the policy and the particular constitutional violation alleged," *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)—in other words, a plaintiff must show that the policy actually caused the constitutional violation, *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)).

Because "official municipal policy includes . . . practices so persistent and widespread as to practically have the force of law," *Connick*, 563 U.S. at 61, a municipality may be liable under § 1983 for failing to adequately train its employees, investigate allegations of abuse, or screen job applicants before hiring them. *See Canton*, 489 U.S. at 388 (failure to train); *Groman v. Township of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995) (failure to investigate); *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 581 (3d Cir. 2004) (failure to screen).

"Failure to adequately screen or train municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations." *Berg*, 219 F.3d at 276. However, "[i]n a narrow range of circumstances," a plaintiff may proceed on a "single-incident" theory of liability. *Bd. of Cty. Comm'rs*, 520 U.S. at 398. This is possible only when "the need for more or different training [(or, in theory, screening)] is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that a municipality's failure to train or screen may amount to deliberate indifference even though the only constitutional violation is the one underlying the case at hand. *See Canton*, 489 U.S. at 390.

Plaintiffs do not argue that their *Monell* claims fit into the narrow single-incident framework. As explained below, however, Plaintiffs' failure-to-screen claim is necessarily based on a single-incident theory, and so it is analyzed that way.

### b. The Specific *Monell* Claims

Plaintiffs' claims against the District, as noted above, fall into three categories: failure to investigate, failure to train, and failure to screen.

#### i. *Failure to Investigate*

At the heart of Plaintiffs' investigation claims are alleged problems with both the B.F. investigation in 2007 and the Poe investigation in 2011.

##### A. The B.F. Investigation

In Plaintiffs' view, the problems with the B.F. investigation started even before B.F. came forward and alleged that Hochschwender had touched her inappropriately. As soon as Hochschwender began teaching fifth grade at Darby in 2006, Dunwoody, the principal at the time, routinely observed him putting his arm around teachers and students alike—in the case of students, up to eight times over the course of his first year. Ex. T at 54:24–55:3, 56:22–57:6. Dunwoody thus often felt it necessary to speak with Hochschwender about "classroom culture and the informality he had with students," as well as remind him to be "less in proximity" with them. Ex. T at 54:17–21, 56:3–6. It was against this backdrop that B.F. went to see Bristow, Darby's guidance counselor, and alleged that Hochschwender, her teacher, had put her hands in his lap close to, but not touching his penis, and held them there for 10 seconds.

Bristow elected not to report B.F.'s allegations to Children and Youth Services (CYS). She later testified that if B.F. had claimed that Hochschwender had engaged in unambiguously sexual conduct, such as kissing or over-the-clothes genital touching, she would have referred the

matter to CYS. Ex. W at 26:12–14, 36:21–23, 51:15–52:6. But based on Bristow's understanding of the types of conduct that CYS considered reportable—developed through her frequent interactions with CYS—she determined that CYS would not accept a referral about the B.F. allegation. Ex. W at 46:9–47:19. As she later put it, while "the situation was very vague or gray in a sense, a boundary line had not been crossed that would have caused me to call the county." Ex. W at 36:12–20.

Plaintiffs make much of Hochschwender's over-familiarity with his students, and Bristow's failure to report B.F.'s allegations to CYS, but these facts are not as damning as Plaintiffs make them out to be. To start, it bears mention that Plaintiffs do not claim—and nothing in the record indicates—that any of the earlier physical contact between Hochschwender and other students that Dunwoody observed rose to the level of abuse. Moreover, and crucially, Bristow's decision not to notify CYS was consistent with Pennsylvania reporting laws then in effect.[7] Those laws required that a school employee contact the school's administrator (the principal) only where he or she had "reasonable cause to suspect, on the basis of professional or other training and experience, that a student . . . is a victim of . . . sexual abuse or sexual exploitation by a school employee." 23 Pa. Cons. Stat. § 6352(a) (2007). The administrator would then be required to report the incident to law enforcement. § 6353(a). "Sexual abuse or exploitation," however, was then defined as:

> The employment, use, persuasion, inducement, enticement or
> coercion of any child to engage in or assist any other person to
> engage in any sexually explicit conduct or any simulation of any

---

[7] In the wake of the Penn State abuse scandal involving Jerry Sandusky, Pennsylvania formed a task force on child protection. *See Task Force on Child Protection*, www.childprotection.state.pa.us (last visited Sept. 14, 2017). After conducting hearings, it made recommendations in November 2012. Ultimately, a package of 21 pieces of legislation was enacted, taking effect in December 2014. The applicable statues and regulations here were "pre-Sandusky."

> sexually explicit conduct for the purpose of producing any visual
> depiction, including photographing, videotaping, computer
> depicting or filming, of any sexually explicit conduct or the rape,
> sexual assault, involuntary deviate sexual intercourse, aggravated
> indecent assault, molestation, incest, indecent exposure,
> prostitution, statutory sexual assault or other form of sexual
> exploitation of children.

§ 6303(a). Plaintiffs make no attempt to place B.F.'s allegation—that Hochschwender briefly

held her hands in his lap near his penis—anywhere within that definition. Indeed, they concede

that, as to B.F.'s allegation, "there was nothing, frankly, sexual about it." Tr. of Oral Arg.

46:19–47:5.

In Defendants' view, the preceding discussion is beside the point, because shortly after

making her allegation, B.F. completely retracted it. Ex. R at 26:17–21; Ex. T at 40:17–19. In

B.F.'s own words, she "just completely denied the whole thing." Ex. R at 17–21.[8] Plaintiffs

counter that B.F.'s retraction was not credible, offering two reasons. First, they point to evidence

that B.F.'s allegations were met with open skepticism that inhibited her from pressing her

complaint. As B.F. later recalled, upon learning of Hochschwender's actions, Bristow told her:

"this is a serious issue. You got to think about [Hochschwender's] family, like think how they

would feel. You could ruin this guy's career." Ex. R at 16:4–10. And Dunwoody, who later

met with B.F. (more on this below), echoed Bristow's theme, telling B.F., "If it didn't happen,

think about it before you say it to anyone." Ex. T at 47:4–13. B.F. claims that this reaction

"changed how [she] thought about" her accusations because it made her realize she "could get

into a lot of trouble," and she "d[id not] want to do that to his family." Ex. R at 16:4–22.

Second, Plaintiffs point to the fact that Bristow and Dunwoody arranged a meeting between

---

[8] B.F. was interviewed by police on March 17, 2014, following Hochschwender's arrest.
There are no documents memorializing what she said originally in 2007.

them, B.F., B.F.'s mother, and Hochschwender himself. Ex. R at 21:21–24:15. Hochschwender's presence at the meeting, they claim, is not only a sign of a poorly run investigation, but proof that B.F.'s purported retraction was in reality something closer to an extraction. About that meeting, B.F. indeed later told police: "So they bring him in. And I'm just sitting there like is he here . . . . I know I'm going to deny it. Because I have him as a teacher in class. I'm freaking out inside." Ex. R at 23:23–24:15.[9]

Plaintiffs' critique has merit: few would say the B.F. investigation was well run. The initial skepticism toward B.F. was not necessarily an ideal reaction.[10] And as to the decision to bring Hochschwender into the meeting, even Dunwoody later admitted that "in hindsight, perhaps, the judgment was incorrect." Ex. T at 54:1–11.

But these investigative missteps are not sufficient to defeat summary judgment. As noted above, the conduct at issue was not "frankly sexual." From a legal perspective, B.F. never accused Hochschwender of anything approaching the then-current statutory definition of sexual abuse or exploitation, meaning that Bristow was not required to internally report it to Dunwoody

---

[9] While the weight of the record shows that B.F. retracted before Dunwoody was ever notified and thus before the group meeting was held, there is also evidence indicating that B.F. first retracted at the group meeting. *Compare* Ex. T at 42:3–9 (Dunwoody stating that the retraction occurred before she was told), *with* Ex. R at 26:8–27:7 (B.F. indicating that the retraction occurred at group meeting). For the reasons given below, however, I find any dispute on this point immaterial.

[10] It should be noted that any skepticism was likely driven in part by B.F.'s general reputation at the time. B.F., who had then recently transferred into Darby from a Catholic school, experienced a "tremendous amount of social transitional challenges" and so "came very, very frequently up . . . to the guidance counselor to talk about her struggling to get along with the other girls." Ex. T at 37:22–38:20. In those meetings with Bristow, B.F. "had a habit of [saying something before] retracting it or saying it was okay now." Ex. T at 38:21–39:22. It was against this pattern of behavior that Dunwoody ultimately suspended B.F. from school for a day for making and then retraction her allegation against Hochschwender. Ex. T at 49:9–14.

and Dunwoody was not required to report it to outside authorities.[11]  Moreover, neither the substance of B.F.'s allegations nor Dunwoody's observations of Hochschwender's conduct supplied notice that Hochschwender posed an obvious and substantial risk to his students.  Under these circumstances, Bristow and Dunwoody's investigation into B.F.'s claims was, at worst, negligent, but negligence is not the requisite standard of culpability here.  Rather, Plaintiffs must show deliberate indifference—"a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions."  *Thomas*, 749 F.3d at 223.  On this record, such a showing is not possible with respect to the investigation of B.F.'s allegations.[12]

### B.   The Poe Investigation

In early 2011, four years after B.F. made her allegation, Plaintiff Poe, then a student in Hochschwender's fifth-grade class, came home from school one Friday and told her father that while she was leaving class to go to the bathroom that day, Hochschwender had "patted her on the butt."  Ex. FFF at 49:1–7.  She also said that Hochschwender routinely "violates other people's personal space"—such as by putting his hands on their shoulders, picking them up, and

_____

[11] This conclusion is consistent with the opinion expressed by defense expert, Anne Shenberger, who worked for the Office of Children Youth and Families in the Pennsylvania Department of Public Welfare for 30 years.  *See* Ex. DDD at 10–13.  Plaintiffs' expert does not offer any contrary interpretation.

[12] Hochschwender was not disciplined for the incident with B.F.  Ex. T at 60:19–23.  Nevertheless, for the rest of the school year Dunwoody spoke with Hochschwender twice a month about his "familiarity with students."  Ex. T at 59:3–22.  More generally, Dunwoody was "concerned about his effectiveness as a teacher"; "he did not have," in her words, "the best sense of expectations for the students.  He was very, very forgiving[.]"  Ex. T at 64:12–65:5, 66:2–9.  She also observed, however, that around that time Hochschwender seemed to be "going through some traumatic personal experience" as the result of a recent separation or divorce, and had "lost a tremendous amount of weight."  Ex. T at 64:12–65:15.  At the end of that school year (2006–07), as part of routine teacher evaluations, Dunwoody shared these concerns with the District's superintendent.  Ex. T at 63:20–68:4.  As with Hochschwender's earlier instances of physical conduct, there is no indication that any of his continued physical contact with students was abusive.

"standing real close"—and that "other children feel uncomfortable around him." Ex. FFF at 49:17–25, 51:21–52:5. On an earlier occasion, Poe had told her father that Hochschwender had "reprimanded her and got close to her face." Ex. FFF at 40:13–24. But this was the first time the father "heard of like a sexual matter," and so when Poe went to school that Monday, her father went with her to report her allegation. Ex. FFF at 50:1–9, 53:2–8.

At the school, Poe first made a written statement, describing "certain instances about [Hochschwender] and the way it happened." Ex. FFF at 55:10–56:23, 57:19–23. The substance of Poe's complaint against Hochschwender, Jordan recalls, was "about touching the girls." Ex. X at 87:4–88:3. And the use of the plural is significant, because Poe's father had also brought with him a list of several other female students in Poe's class who had similar complaints about Hochschwender. Ex. X at 86:12–18.

Both the substance of this list and when it was precisely created and turned over remain unclear. On substance, Poe's father testified that he came up with the idea for the list after he had chaperoned a field trip, observed Hochschwender in person, and "didn't like the look of him already." Ex. FFF at 60:8–61:9. He then suggested that Poe "go around and ask the other children . . . if he's ever made them feel uncomfortable to sign the paper," which she then did. *Id.* Jordan, however, recalls that the list named girls who not only felt uncomfortable around Hochschwender but who had been "similarly touched." Ex. X at 86:12–18. And Jordan's description of his subsequent investigation—described more fully below—further demonstrates his understanding that Hochschwender touched multiple girls' buttocks. On timing, the clearest inference from the record—and the one on which Plaintiffs proceed (Resp. at 9)—is that Poe's father brought this list to school at the same time that he reported Poe's allegation, which was a mere three days after her initial complaint to him. *See* Ex. X at 90:14–21, 95:5–7; Ex. FF at

53:10–24; Ex. S at 85:19–86:16.  But Poe's father seems to recall that the list was possibly created, and thus necessarily turned over, much later on.  Ex. FFF at 67:13–24.  In any case, on Defendants' summary judgment motion, the record must be viewed in the light most favorable to Plaintiffs.  I therefore adopt Plaintiffs' version of events, that the list was of students who had been similarly touched—which is to say patted on the buttocks—and that it was delivered at the same time as the report of Poe's allegation.

Upon receiving the list of names and learning the details of Poe's allegations, Jordan instructed Mosakowski, his assistant principal, to transfer Poe out of Hochschwender's homeroom class for the remainder of the school year.  Ex. FF at 56:21–57:10.  What happened next is a matter of considerable disagreement.

In Jordan's telling, he first telephoned Ryan, the District's assistant superintendent, and shared his belief that the allegations against Hochschwender warranted an internal investigation, an assessment with which Ryan purportedly "agreed."  Ex. X at 89:20–90:4.  Ryan recalls only that Jordan told him that a father was making complaints about a teacher and that he "advised [Jordan] to talk to the parent."  Ex. S at 87:14–24.  Indeed, Ryan maintains that until Hochschwender's arrest, he was unaware that Poe and her father had accused Hochschwender of inappropriate touching.[13]

Jordan next claims that, after his conversation with Ryan, he and Mosakowski approached Hochschwender, informed him of the allegations (which he denied), and told him that he would be suspended from teaching with pay pending the investigation.  Ex. X at 90:5–13.  Jordan says that he and Mosakowski then brought in Bristow, still Darby's guidance counselor,

---

[13]As Ryan recalled, his "assumption was that the child got a grade that the parent didn't agree with or maybe got a detention or a recess thing that the parent didn't agree with."  Ex. S at 89:8–22.

18

to help interview approximately three female students—Poe and certain of the girls on the list. Ex. X at 95:8–20.[14] During the interviews, Jordan says he largely left the questioning to Bristow and Mosakowski because he believed the students would be more comfortable speaking with women and because "it was more appropriate for a guidance counselor" to question students. Ex. X at 93:9–95:1. Jordan specifically remembers Bristow asking each student to describe what Hochschwender did and whether they "believe[d] it was intentional." Ex. X at 95:21–96:11. She even had them "stand up and position themselves and how Mr. Hochschwender was walking between the desks," to recreate the alleged incidents of inappropriate contact. *Id.* Based on these interviews, Jordan says that he, Mosakowski, and Bristow "all agreed" that any physical contact between Hochschwender the students had been "inadvertent," Ex. X at 97:3–20,[15] and that the investigation therefore "couldn't proceed further." Ex. X at 98:18–99:3.

Bristow and Mosakowski claim that none of this took place. Specifically, when Bristow was asked whether she ever met with Jordan and Mosakowski regarding Poe's allegations, she stated "I never had such a meeting." Ex. W at 62:8–9. And when asked whether she questioned Poe and the other students who accused Hochschwender of misconduct in 2011, she testified: "that did not happen." Ex. W at 63:22. Likewise, when Mosakowski was asked during her

---

[14] Jordan claims that before speaking with any of Hochschwender's accusers, he first reached out to their parents and invited them to participate in the investigation, but "none of them took [him] up on that." Ex. X at 95:8–20.

[15] None of the students, Jordan recalls, "ma[de] a good case that Mr. Hochschwender intentionally . . . touched their butts, like reached out and grabbed them." Ex. X at 96:17–23. Rather, the best Jordan could tell, they had all been "involved in a classroom exercise where people were out of their seats . . . and there's a lot of desks," and Hochschwender made contact with them just by "kind of going through. He's a tall man, and he was kind of working his way through the aisle." Ex. X at 97:21–98:7. Because of this, Jordan "couldn't clearly report" that Hochschwender "intentionally, like, inappropriately reached out and grabbed a fifth grade girl's—any of them, their—their butts." Ex. X at 97:3–20.

deposition whether she helped interview Hochschwender's accusers, and whether she and Jordan ever met with Hochschwender regarding Poe's allegations, she answered, respectively, "I deny that happened," Ex. FF at 70:16, and "No," Ex. FF at 71:23.

Jordan's account of the investigation's aftermath is similarly at odds with that of his former colleagues  Before allowing Hochschwender to return to the classroom, Jordan claims that he placed him on a "teacher improvement plan" that forbade him from "touch[ing] a child," "break[ing] their personal space," or even "yell[ing] at them." Ex. X at 105:3–9.[16] Jordan says that he explained the plan to Hochschwender during a meeting with Mosakowski and with Karcher, the union representative.  He further maintains that the plan was put into writing, signed by Hochschwender, and given to Ryan.  Finally, Jordan says that he also gave to Ryan a complete report on the findings of his investigation into the Poe incident.  Mosakowski, however, denies discussing a teacher improvement plan with Hochschwender, Karcher, and Jordan. Ex. FF at 71:7–8.[17]  Ryan, for his part, says he never received a copy of the teacher improvement plan or investigation report, and also claims that neither document could be located in the District's files.

Curiously, Plaintiffs barely mention the contradictions between the testimony of Bristow and Mosakowski on the one hand, and Jordan on the other.  Pls.' SOF ¶¶ 115, 156.  Indeed, although they note Ryan's assertion that Jordan never told him the substance of Poe's allegation

---

[16] Jordan also claims that he "didn't think [Hochschwender] was a terrific teacher," and so included within the improvement plan something "to do with academics," which required that Hochschwender "really focus on teaching."  Ex. X at 108:2–11.

[17] Karcher has no recollection of attending a meeting to discuss Hochschwender's teacher improvement plan but could not rule out the possibility that such a meeting took place.  Ex. AA at 64:18–20.

or sent to him a report and teacher improvement plan, Plaintiffs seem to assume that Jordan's investigation otherwise unfolded as he says it did.

This apparent acceptance of Jordan's account is not compelled by the record. Rather, if Bristow's and Mosakowski's testimony is credited, then one of two conclusions follows: either (1) Jordan interviewed Hochschwender's accusers but, contrary to his testimony, did so without aid and in secret, or (2) Jordan never actually interviewed Poe, and the other girls.

The latter inference would support a finding that Jordan's inaction demonstrated deliberate indifference. Read in the light most favorable to the Plaintiffs, the record shows that Jordan knew of accusations from at least three girls who claimed that Hochschwender touched their buttocks. If Jordan failed to take even cursory investigatory action when faced with what can be fairly characterized as an alleged pattern of blatantly inappropriate and potentially sexual contact, then he consciously disregarded the substantial risk that the allegations against Hochschwender were true.

But even adopting this damning interpretation of Jordan's conduct, Plaintiffs do not have a viable § 1983 claim against the District. Under any reading of the record, the fatal flaw in Plaintiffs' failure-to-investigate theory of *Monell* liability is that they have not shown that Jordan's conduct, whatever it may have been, was the result of a policy or custom.

Regarding policy, Plaintiffs do not argue that the District's policies compelled an inadequate investigation into the B.F. and Poe incidents; in fact, they argue the opposite. According to Plaintiffs, the District enabled Hochschwender's abuse either because it *failed to maintain adequate policies* on training, or because it allowed its employees to routinely *violate*

*policy* by not (1) conducting reasonable investigations, (2) reporting credible allegations of abuse to law enforcement,[18] or (3) maintaining records of alleged abuse in personnel file.

Because Plaintiffs do not attempt to hold the District liable based on its policies, they must show that there existed within the District a widespread pattern of deliberate indifference to credible allegations of sexual abuse—in other words, a custom. *See Kneipp*, 95 F.3d at 1212 ("[T]he Supreme Court recognize[s] a two-path track to municipal liability under § 1983, either through government policy or custom."). Plaintiffs attempt this by pointing to the events of the 2006–2007 school year. But, as discussed at length above, Dunwoody and Bristow were, at

---

[18] On this point, Plaintiffs argue that Jordan's statements to police in 2014 show that he knew in 2011 that the allegations against Hochschwender were credible. Specifically, Jordan referring to Hochschwender, said: "I really didn't want him in my building." Ex. EE at 13:6–11. When pushed, Jordan elaborated:

> [B]ecause it was too risky. What—what if, you know, it wasn't inadvertent, even though I determined it to be inadvertent? Because I couldn't—I'm not a police officer and I couldn't say for sure. I mean it's serious if—we have to protect the children. But what if that allegation, what if—what if I was wrong? Then—then I mean—it wasn't appropriate for him to be in a fifth grade classroom.

*Id.* at 13:12–23. I am unconvinced that these statements, standing alone, support an inference that Jordan violated his students' constitutional rights.

Most of what Jordan said to the police is couched entirely in a hypothetical: *if* Jordan "was wrong," *then* it "wasn't appropriate for him to be in a fifth grade classroom." Such *post hoc* conditional reservations say little about whether Jordan was deliberately indifferent at the time he conducted the investigation. And if one assumes (as Plaintiffs appear to) that Jordan took the investigative steps he says he did, then his statements reveal only that, after having made a considered decision that entailed some risk, he was concerned about the consequences should that risk come to bear—a perfectly natural reaction. There is no inconsistency, let alone one of constitutional dimensions, between Jordan's not being "'sure' about what happened" and his formal determination that he did not at the time have "reasonable cause to suspect . . . sexual abuse or sexual exploitation."

On the other hand, if one infers from Bristow's and Mosakowski's testimony that Jordan did not in fact conduct an investigation, then his statements to police can be read as a partial admission of his failure to treat the allegations against Hochschwender with sufficient seriousness. In sum, Jordan's statement does not have determinative legal significance; its meaning depends entirely on the context in which it is read.

worst, negligent in their handling of Hochschwender's inappropriate but concededly non-sexual contact with his students. Their actions therefore do not support an inference that the District had a custom treating abuse allegations with deliberate indifference. Further weighing against a finding of custom, around the time of the Poe incident, the District not only investigated, but referred to law enforcement, at least three separate reports that teachers or staff members had engaged in improper contact with students. Ex. U at 41:9–47:24. Moreover, in two of these cases, the teachers were forced to resign and their teaching certifications were revoked. Ex. U at 43:2–44:7, 44:10–45:2.[19] These actions show that the District repeatedly took seriously allegations of sexual abuse. Absent compelling evidence to the contrary, I find this sufficient to defeat Plaintiffs' claim that the District had a custom of failing to investigate alleged misconduct.

Without a policy or custom on which to base municipal liability, Plaintiffs' claim is, in the final analysis, an attempt to bootstrap District liability based on the mistakes of its administrators, Jordan in particular. The whole point of *Monell* and its progeny, however, is that "municipalities should not be liable for an employee's wrongful acts, simply by applying agency-based principles of *respondeat superior*." *Los Angeles County v. Humphries*, 562 U.S. 29, 38 (2010). Defendants' motion for summary judgment will therefore be granted as to Plaintiffs' failure-to-investigate claim against the District.

> ii. *Failure to Train*

In addition to their claims that the District failed to properly investigate allegations of child abuse, Plaintiffs also advance a distinct theory that the District failed to train its employees on how to conduct those investigations. As evidence, Plaintiffs point to multiple instances in the

---

[19] In the third, the staff members were not disciplined because the District's investigation showed that the charges were unfounded. Ex. U at 47:11–19. In no case did law enforcement end up bringing criminal charges. Ex. U at 43:21–44:7, 44:10–45:2, 47:11–18.

record of District staff either being unable to remember such training or openly admitting that they never received it prior to either of the investigations relevant here.[20]  But these claims also fail as a matter of law, because although there is some support for Plaintiffs' view that the District's training was inadequate, there is no evidence that any such inadequacies caused the constitutional violations alleged here.

Initially, it appears true that, reading the evidence in Plaintiffs' favor, the District could have done a better job training its administrators how to investigate allegations of child abuse. The most prominent example of this comes from Jordan, who testified that he never received training from the District on how to conduct such an investigation or how to distinguish between what constituted appropriate touching of a child and what did not.  Ex. A at 115:16–116:1, 119:20–23.  Mosakowski testified similarly; in fact, during the Poe investigation, she "was learning from Dr. Jordan.  This was [her] first administrative job."  Ex. FF at 132:17–133:14.[21] And finally, though Plaintiffs do not allege that Bristow, the guidance counselor during both the B.F. and Poe investigations, failed to receive such training, they do claim (Resp. at 6) that Bristow's "bizarre notion" of what sorts of conduct did and did not amount to reportable child abuse "could not have been conceived by a properly trained school administrator."

---

[20] Plaintiffs also rely on an expert report.

[21] Hochschwender testified that while he remembers receiving regular training from the District on what actions constituted child abuse, he does not recall the specifics of that training, and in particular does not recall any instruction on what sorts of physical contact with a child is inappropriate.  Ex. BB at 28:3–22, 30:15–8.  He also admitted that, in between B.F.'s and Poe's allegations, the District did not provide him with additional training "regarding contact with children."  Ex. BB at 66:3–15.  But while Plaintiffs point to this—and for obvious reasons—it is unclear how Hochschwender's admissions are legally relevant to Plaintiffs' failure-to-train claims.  The theory of those claims is not that the District failed to train Hochschwender on where the line was between permissible conduct with children and not.  Instead, the theory is that other employees—in particular, higher-ups—were not trained on how to investigate an allegation that a teacher had crossed that line.

To be sure, others recall that the District took a more proactive approach. For instance, Dunwoody, Darby's principal during the B.F. investigation, testified that, in her previous role as the District's curriculum director, she had "made sure" that new teachers were "aware of . . . and understood" the District's policy on reporting child abuse. Ex. T at 22:12–23:12. That policy, she testified, "mandated" that any school employee who becomes aware of "any kind of inappropriate behavior" report it to the principal. Ex. T at 24:13–25:1. Butz, the District's superintendent since 2009, testified that not only did the District's written policy "clearly" require employees "to report [to law enforcement] when they have reasonable cause to suspect" child abuse, but also that in 2008 and 2010, outside attorneys, including from the Pennsylvania State Education Association, came in to train all District staff on reporting requirements. Ex. U at 37:7–12, 38:10–14, 123:5–124:4; *see also* Ex. S at 149:19–150:13 (Ryan testifying similarly).[22] Karcher, the union representative at all times relevant here, helped organize these trainings, each of which she recalls as being an "umbrella type thing," instructing teachers on everything from "social media" and "professional behavior" to "touching" and reporting requirements. Ex. AA at 31:7–32:12.

Viewed broadly, then, the record tells conflicting accounts about whether the District adequately trained its employees on investigating allegations of child abuse—and so one might think that a jury should be allowed to decide which version is true. But not here, because regardless of any inadequacies in the District's training program, Plaintiffs cannot demonstrate that those inadequacies were the cause of the constitutional violations they allege. The reason is

---

[22] Virtually identical training was provided to all staff in 2012. Ex. U at 123:16–124:1. And a year later, soon after Butz participated in a statewide training designed to "mak[e] sure that superintendents and the staff going down the line w[ere] aware of what educator misconduct consisted of and . . . what reports needed to be filed and when," all District staff—approximately 700 employees in total—again received similar training. Ex. U at 121:22–122:16.

that after each relevant allegation of abuse, the proper officials either conducted investigations that, if not exactly models to follow, were constitutionally adequate (Dunwoody and Bristow, in the case of B.F.), or demonstrated through their testimony that they knew how to do so, despite their lack of training from the District (Jordan, in the case of Poe, as discussed below).

Regarding Jordan, even if the District failed to train him on how to conduct investigations, he had nonetheless received that training elsewhere. According to Jordan, before coming to Darby, he was an elementary school principal in the Central Dauphin School District—a "very large district" with "in-house psychiatrists or psychologists"—where he was trained on "appropriate versus inappropriate touching" and how to investigate a claim that a teacher had engaged in the latter kind. Ex. X at 116:3–119:10l. Butz corroborated Jordan's account, noting that Jordan had taken courses required by the Pennsylvania Department of Education on mandatory reporting and on how to conduct an investigation before joining the District.[23]

Given this prior experience, it is perhaps unsurprising that Jordan says he knew how to investigate Poe's allegations: "[Y]ou remove the adult so that he can't intimidate. . . . You get parents' permission to be part of the questioning. You get the guidance counselor . . . to do it, and . . . you make sure that the union rep is with the teacher." Ex. XX at 119:10–19. Or, in Jordan's words, "everything I did." *Id.* Admittedly, Bristow's and Mosakowski's testimony casts doubt on whether Jordan in fact took all of these steps. But that is irrelevant for present purposes. With respect to Plaintiffs' failure-to-train claim, what matters is that, despite the

---

[23] Butz himself had started his career as a "social worker working with child abuse victims and sexually abused victims and their families." Ex. U at 35:12–36:22. And Mosakowski, who had been an educator for well over a decade by the time of the Poe investigation, had also received training on conducting child-abuse investigations when she was in college. Ex. FF at 21:21–23:8, 130:18–23.

District's failure to train him, Jordan was able to describe a constitutionally adequate investigation.

Constitutionally adequate, at least in part, because Jordan's purported investigation was consistent with then-current state law and District policy.[24] As in 2007, Pennsylvania law at the time of the Poe incident continued to define sexual abuse as:

> The employment, use, persuasion, inducement, enticement or coercion of a child to engage in or assist another individual to engage in sexually explicit conduct. [Or] [t]he employment, use, persuasion, inducement, enticement or coercion of a child to engage in or assist another individual to engage in simulation of sexually explicit conduct for the purpose of producing visual depiction, including photographing, videotaping, computer depicting and filming.

23 Pa. Cons. Stat. § 6352(a) (2011). Although the allegations of Poe and her classmates were undeniably troubling, they did not clearly fall within the demanding statutory definition of sex abuse. Moreover, under the District's policy in 2011 (No. 806), and the nearly identical state reporting law, Jordan was required to report a case to CYS and law enforcement only if he received a report of abuse from a school employee, or by other means had a "reasonable cause" for believing that abuse took place. Ex. N at 4 (citing 23 Pa. Cons. Stat. § 6352(a)(1) (2007)); *cf.* § 6352(a)(1) (2011) (identical to 2007 version). Contrary to Plaintiffs' claims, then, it does not appear that Jordan would have blatantly abused his authority by undertaking his own investigation rather than immediately referring the matter to the police.[25]

_____

[24] Of course, compliance with state law is no defense against a § 1983 claim premised on a deprivation of federal rights. The apparent consistency between Jordan's purported investigation and state law is relevant, however, to whether he could be deemed to have acted with deliberate indifference by carrying out the investigation that he described. Because compliance with applicable law and policy suggests that Jordan did not act with conscious disregard for the well-being of Hochschwender's students, I find it supports a finding that his purported investigation was constitutionally adequate.

[25] Notably, as with the B.F. allegation, defense expert Anne Shenberger found that there was no obligation to report this set of allegations to law enforcement. *See* Ex. DDD at 13. Butz

Furthermore, the investigative steps that Jordan listed are at a minimum inconsistent with, and arguably incompatible with, deliberate indifference. Upon learning of the allegations against Hochschwender, Jordan claims he promptly alerted the appropriate administrators, confronted the accused, solicited the help of affected parents, questioned the accusers, conferred with colleagues, documented his findings, and put in place procedures designed to prevent future inappropriate contact. If Jordan indeed took these steps, then even if he mistakenly concluded Hochschwender's actions were inadvertent, no reasonable jury could find that he deliberately ignored a known or obvious risk to his students. More to the point, if Jordan failed to take these steps, it wasn't because he didn't know how.[26]

The upshot is that even if the District had provided no training at all on how to do a proper investigation, Plaintiffs cannot show that more or better training would have prevented any of the constitutional violations they allege here. Plaintiffs' expert, Dr. Edward Dragan, who hardly paints a damning picture of the District's failure to train in general, is particularly inconclusive on causation. Dr. Dragan's chief conclusion was that District administrators "are not extensively trained to investigate child abuse and for that reason, [District] policy in effect in 2007 and 2011 . . . requires immediate report of *suspected* (emphasis added) child abuse to the school principal, who was then required to make an immediate report to ChildLine

---

agreed, noting, of Jordan's investigation, "working on his assumptions, he followed procedure." Ex. U at 156:5–21.

[26] Nothing in the record suggests that Jordan might have learned appropriate investigative procedures after the Poe incident. Neither party has identified any training that Jordan received from the District between spring 2011, the time of Poe's accusations, and April 2012, when Jordan resigned following his arrest on domestic violence charges (Jordan has not worked in a school since his resignation). And when, without warning, police called Jordan in 2014 to interview him as part of their criminal investigation into Hochschwender, Jordan described his investigation into the Poe incident just as he described it in his deposition testimony—a consistency that dispels any notion that he educated himself on proper investigative procedure in anticipation of this lawsuit.

[(Pennsylvania's child-abuse reporting service)]."  No. 15-2369, Dkt. 82-1 at 15.  This conclusion says nothing about whether the District's alleged failure to train was the actual cause of the constitutional violations here, and in this respect stands in marked contrast to certain other failure-to-train claims that have survived summary judgment, *see, e.g.*, *Thomas*, 749 F.3d at 221, 225; *A.M.*, 372 F.3d at 582; *McDaniels v. City of Philadelphia*, ___ F. Supp. 3d ____, No. 15-2803, 2017 WL 590271, at *3, *6–8 (E.D. Pa. Feb. 13, 2017) (Rufe, J.).  Accordingly, Plaintiffs' failure-to-train claim must fail.

### iii. *Failure to Screen*

Finally, Plaintiffs allege that the District failed to adequately screen potential teachers for past incidents of child abuse, leading to Hochschwender's hiring in 2006 even though he had left teaching at Radnor School District "under a cloud of serious allegations of child abuse."  Resp. at 12.  All parties agree that, although District policy required the superintendent to "seek recommendations from former employers and others in assessing [a] candidate's qualifications" (Ex. N at 2), there is no indication that anyone at the District checked Hochschwender's references before he was hired.  Plaintiffs argue that, had someone checked, Hochschwender would not have been hired.

The "cloud" Plaintiffs refer to dates back to 2000, when Hochschwender, then a teacher in Radnor, was accused of inappropriately touching students.  Hochschwender was suspended from teaching pending the results of an investigation.  *See* Ex. A.  The matter was referred to law enforcement, which conducted its own investigation but found there was "insufficient evidence to proceed with any criminal charges."  Pls.' Ex. A.  Hochschwender returned to teaching (Ex. B), but soon after took a leave of absence, ostensibly for medical reasons (Ex. C).  In 2001, while still on leave, Hochschwender resigned from Radnor altogether.  Ex. F.

The main evidentiary basis for Plaintiffs' claim that this incident should have ultimately led the District to refuse to hire Hochschwender six years later is a letter (Ex. B) that the principal of Hochschwender's Radnor school sent him when he returned from his suspension but before taking leave. That letter, which made clear that it "d[id] not represent any form of disciplinary action," set forth "the district's expectations for changes [Hochschwender] needs to make in [his] interactions with children." *Id.* at 1. "In order to avoid the possibility of further question or scrutiny by parents or administrators," the letter instructed, Hochschwender should not engage in certain behaviors with students, including: picking them up or carrying them, rubbing their backs, having them sit on his lap, or "[k]issing or hugging them." *Id.* Plaintiffs claim that the District should have known about this letter's warnings and the incidents (or allegations) that led to them before it decided whether to hire Hochschwender, thus giving the District adequate notice that Hochschwender posed an unacceptable risk of harm to students.

As mentioned earlier, a municipality may indeed be liable for failing to properly screen its employees prior to hiring them. *See A.M.*, 372 F.3d at 581 (permitting a "deficient hiring and staffing" claim to go to a jury). A failure-to-screen claim typically requires the same two elements as a failure-to-train claim: deliberate indifference and causation. *Bd. of Cty. Comm'rs*, 520 U.S. at 409–11.

But in this case, Plaintiffs' screening claims face an additional hurdle, because they rely on a single-incident theory of liability—that is, they do not allege that the District failed to adequately screen any teacher but Hochschwender. The Supreme Court, in *Board of County Commissioners*, cautioned that a single-incident screening claim presents a "particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself." *Id.* at 410. The Court unambiguously held that, "[e]ven

assuming without deciding that proof of a single instance of inadequate screening could ever trigger municipal liability," *id.* at 412, such liability could arise "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right," *id.* at 411.

Plaintiffs have not made this showing. There is no indication that a proper review of Hochschwender's background—namely, checking his references—would have led a reasonable District official to find that the "plainly obvious consequence" of hiring him would be the sorts of injuries the Plaintiffs suffered here. Although there are a few ways to reach that conclusion, the soundest is to simply recount the sequence of events that occurred between the Radnor allegations in 2000 and the District's decision to hire Hochschwender in 2006.

To start, soon after the allegations and around the time law enforcement decided not to pursue criminal charges, Hochschwender returned to regular teaching in Radnor. As counsel for the District put it: "He was in the classroom after that event happened." Tr. of Oral Arg. 13:22–23. And while Hochschwender took medical leave not long after and eventually resigned completely, he then worked as a developer in an early literacy program until 2003. Ex. BB at 24:24–25:8, 26:9–10. At that point, he chose to reenter teaching, starting as a substitute employed by a substitute teaching service that had its own screening process. Hochschwender taught as a substitute for a few years at several elementary schools, all within the District (Ex. BB at 27:8–15) before the District decided to hire him—first, in 2006, as a long-term substitute (Ex. Q), and then, in 2007, as a full-time fifth-grade teacher at Darby (Ex. BB at 27:21–22). Before the District first hired Hochschwender, it ran both a criminal-background check and a

separate child-abuse check through Pennsylvania's statewide database.  Ex. J.  Neither screen turned up anything.

Plaintiffs' position is that an additional reference check on top of all of that would have revealed to someone at the District both the Radnor allegations and the contents of the letter that the principal there subsequently sent to Hochschwender instructing him on how to properly interact with children.  And maybe so.  But even assuming that that information would have turned up, it would have been of little significance, since it would have remained the case that (1) Hochschwender never faced criminal charges over the Radnor allegations; (2) he returned to regular teaching at Radnor afterwards; and (3) his criminal-background and child-abuse checks before he was hired at the District were spotless.  The notion that these countervailing—and undisputed—facts would have been outweighed by unverified allegations from six years prior is difficult to support.  And to establish deliberate indifference Plaintiffs need to not only muster that support, but prove that news of those allegations would have led a reasonable District administrator to conclude that the "plainly obvious consequence" of hiring Hochschwender would be the abuse of students.  On this record, that would be a bridge too far.[27]

_____

[27] Plaintiffs also emphasize the fact that the District's failure to check Hochschwender's references was in breach of its own policy (Resp. at 12–13), and that the real reason Hochschwender took medical leave from Radnor was stress caused by the investigations—information a proper screening would have ferreted out (Pls.' SOF ¶¶ 2–3 (citing Exs. C and D)).  Neither point alters the conclusion here.  As to the District breaching its own policy, it is reasonably well-established that a single breach of an otherwise constitutionally sound policy does not give rise to municipal liability.  *Cf., e.g.*, *Nawrocki v. Township of Coolbaugh*, 34 F. App'x 832, 837 (3d Cir. 2002) ("Although there may have been some inadequacies in the way in which municipal policies were followed in this case, an official's failure to adhere strictly to municipal policies does not itself support an inference of a policy that can subject the Township to liability.").  As to the true reason Hochschwender took medical leave, it is a stretch to think medical records or any information regarding them would ever be turned over as part of a routine reference check—but even if here they had been, there is no basis to conclude that hiring Hochschwender in the face of that additional information would have amounted to deliberate indifference.

Because Plaintiffs cannot establish municipal liability as a matter of law on any of their theories, summary judgment will be granted to the District on each of these claims.

### 3. State-Created Danger Claims

A subset of Plaintiffs bring state-created danger claims against Assistant Superintendent Ryan and Principal Jordan on behalf of the children who were abused by Hochschwender during the 2013–2014 school year—Roe and the three Doe Plaintiffs. These claims arise out of Hochschwender's reassignment to a second grade classroom shortly after the Poe incident in 2011, a move that Plaintiffs contend led predictably and directly to their harm. Because Plaintiffs cannot show that Ryan acted with the requisite high degree of fault or that he could have foreseen Hochschwender's abusive conduct, the claim against him fails. As to Jordan, however, the claim survives.

Regarding Hochschwender's reassignment, this much is clear: sometime in the spring of 2011, someone decided that Hochschwender would teach second grade instead of fifth grade at Darby, effective the following fall. As with much else in this contested record, Ryan and Jordan disagree over who made that decision and why.

According to Jordan, Hochschwender's transfer was Ryan's response to the Poe incident. Jordan says that although he, Mosakowski, and Bristow had cleared Hochschwender of any wrongdoing and he "had no reason to believe [Hochschwender] would touch another student," Ex. X at 141:4–9, he still had nagging doubts about Hochschwender's innocence even after his investigation. As Jordan later told police officers, he felt Hochschwender's continued presence was "too risky" because "if I was wrong . . . then, I mean, it wasn't appropriate for him to be in a fifth grade classroom." Ex. EE at 13:13–23. Independent of these concerns, Jordan also says he never thought much of Hochschwender professionally: "I was not happy with his . . . teaching,

his curriculum," Ex. X at 110:21–22, furthermore "he was a yeller and a—like, he intimidated," *id.* at 111:10–11. With nothing to lose but a sub-par teacher, Jordan says he shared his "too risky" assessment with Ryan, and although Jordan cannot remember his exact words, communicated that he "didn't want [Hochschwender] in this building." *Id.* at 111:6–7. Ryan's immediate response, according to Jordan, was to transfer Hochschwender to second grade over Jordan's protest.

Ryan remembers things far differently. He says Hochschwender's reassignment was ultimately Jordan's decision but claims the move was made because of a District-wide personnel shake-up that was driven by budget cuts. Jordan recalls that the District was "looking at furloughing staff for the upcoming school year [and] . . . had to make sure that the least amount of people got furloughed and the least senior people got furloughed." Ex. S at 110:22–111:5. In this context, each personnel change had a District-wide "domino effect." *Id.* at 111:6. And so, when a teacher named Shannon Matteo was transferred to Darby from a neighboring school, something had to give. In Ryan's telling, Jordan elected to place Matteo in a fifth grade classroom and asked that Hochschwender be reassigned to second grade to make room. Because Jordan never informed him of the allegations against Hochschwender, Ryan says he had no reason to deny Jordan's request. Thus, Ryan contends that Hochschwender's transfer was Jordan's call and he merely "signed off." *Id.* at 110:6–7.[28]

---

[28] Actually, Defendants' evidence—a spreadsheet from May 10, 2011, showing various staffing reassignments throughout the District— partially undermines Ryan's version of events. Consistent with Ryan's testimony, the spreadsheet lists 24 teachers slated for reassignment, including Shannon Matteo. Ex. G. But while Matteo is listed as an incoming teacher at Darby, she is assigned to teach first, not fifth grade. At the same time, Hochschwender is still slated for reassignment to second grade. Defendants explain away this apparent inconsistency with Ryan's testimony by noting that the May 10 version of the spreadsheet was later updated. Yet they fail to produce a later version of the staffing reassignments that fully corroborates Ryan's account that Hochschwender was moved to make room for Matteo.

Plaintiffs contend that whether one credits Jordan's or Ryan's account, one of them consciously disregarded the likelihood that Hochschwender posed a substantial risk of harm and is therefore liable on a theory of state-created danger.

      a.  Elements of a State-Created Danger Claim

Although "the Due Process Clause imposes no affirmative duty to protect a citizen who is not in state custody," under a state-created danger theory, a substantive due process violation (in this case, invasion of bodily integrity) may occur "when state authority is affirmatively employed in a manner that injures a citizen or renders him more vulnerable to injury from another source than he or she would have been in the absence of state intervention." *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006) (citation omitted).

To prevail on a state-created danger claim, a plaintiff must establish four somewhat over-lapping elements: (1) the defendant's action "forseeabl[y] and fairly direct[ly]" caused the plaintiff's harm; (2) the defendant acted "with a degree of culpability that shocks the conscience"; (3) the state and the plaintiff had "a relationship . . . such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general"; and (4) the defendant state actor "affirmatively used his or her authority in away that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Id.* I consider each of these elements below, starting with the fourth.

      b.  Application of the Controlling Principles

        i.  *Affirmative State Action that Causes Harm*

"[A] state's failure to take affirmative action to protect a victim from the actions of a third party will not, in the absence of a custodial relationship . . . support a civil rights claim."

*Bright*, 443 F.3d at 282 (quoting <u>*Brown v. Grabowski*</u>, 922 F.2d 1097, 1101 (3d Cir. 1990)). Thus, "[i]t is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Id.* "But a specific and deliberate exercise of state authority, while necessary to satisfy the fourth element of the test, is not sufficient." *Kaucher v. County of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006). There must also be "a direct causal relationship between the affirmative act of the state and plaintiff's harm," such that the action "was the 'but for cause' of the danger faced by the plaintiff." *Id.*

Jordan and Ryan both contend that Plaintiffs have failed to establish the affirmative action element of their state-created danger claim, but offer different reasons why. Jordan argues that Plaintiffs' claim is based on his alleged failure to investigate Poe's allegations, and does not encompass any affirmative misuse of authority. Ryan, meanwhile, contends that there is no but-for causal link between his actions and Hochschwender's abuse of his second-grade students. Neither argument is persuasive.

Jordan misreads Plaintiffs' claim. Although Jordan's alleged failure to investigate is essential to Plaintiffs' theory of culpability (more on that below), Plaintiffs' state-created danger claim is based on Hochschwender's reassignment to a second grade classroom—a clear affirmative act, undertaken by either Ryan or Jordan, depending on whose testimony is credited.

Ryan misreads the law. Starting from the premise that "much of the case law analyzing a state-created danger claim indicates a temporal relationship between the alleged affirmative act and the alleged harm," MSJ at 31, he leaps to the conclusion that temporal proximity between act and injury is a required element of the state-created danger test. On this theory, he contends that the two- or three-year gap between Hochschwender's reassignment and the harm to Roe and the

three Does defeats any inference of causation.[29]  I disagree.  Ryan's argument is wholly

unsupported by the cases he cites,[30] all of which involved acts that were closely followed by

harms, but none of which so much as mentioned temporal proximity as a relevant factor in its

analysis of causation.  And while a tight temporal nexus between act and harm "may," as

Plaintiffs concede, "provide circumstantial evidence of causation," Resp. at 14, it is not required

in every instance and was not required here.  Hochschwender abused Roe and the Doe Plaintiffs

because he was their teacher and he was their teacher because of Jordan's or Ryan's decision to

transfer him to a second grade classroom.  Notwithstanding the gap between Hochschwender's

reassignment and Plaintiffs' harm, an unbroken and straightforward causal chain connects the

two events.[31]  This is sufficient for the fourth element of Plaintiffs' state-created danger claim.

### ii.  *Culpability that Shocks the Conscience*

In state-created danger cases, "[t]he exact degree of wrongfulness necessary to reach the

conscience-shocking level" depends "on the extent to which a state actor is required to act under

pressure."  *Walter v. Pike County*, 544 F.3d 182, 192 (3d Cir. 2008) (citations omitted).  So "in a

hyper-pressurized environment" calling for split-second decision-making, "an intent to cause

---

[29] It is unclear when exactly during the 2013–2014 school year Hochschwender abused Roe or the three Does.

[30] *Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004); *Kneipp*, 95 F.3d 119; *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364 (3d Cir. 1992); *Mitchell v. Duval Cty. Sch. Bd.*, 107 F.3d 837 (11th Cir. 1997).

[31] Ironically, Hochschwender's transfer decreased the risk of harm to Darby's fifth-grade population, but that offsetting benefit is without legal significance under the rubric of state-created danger.  Rather, under the doctrine's fourth element, the appropriate analysis is whether the defendant's affirmative act caused or increased the risk of danger to the particular plaintiff.

harm is usually required." *Id.* At the other extreme, "where deliberation is possible and officials have time to make unhurried judgments, deliberate indifference is sufficient." *Id.*[32]

Because Ryan or Jordan had days if not weeks to decide where to place teachers for the 2011–2012 school year, the decision to transfer Hochschwender to second grade is properly analyzed under the deliberate indifference standard.

Deliberate indifference "requir[es] a conscious disregard of a substantial risk of serious harm," and thus "might exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 246 (3d Cir. 2016). Plaintiffs' theory of culpability is that Ryan or Jordan demonstrated deliberate indifference because they ordered Hochschwender's transfer while disregarding the risk that he would abuse his students—a known or obvious danger in the aftermath of the Poe incident. Or as they put it: "either [Jordan] requested transferring to second grade a teacher he considered 'too risky' for fifth grade, or [Ryan] ordered the transfer, despite knowing that the teacher had been the target of a credible complaint." Resp. at 11–12.

As to Ryan, Plaintiffs' theory is unpersuasive. If Ryan's testimony is credited, he cannot be faulted for "sign[ing] off" on Hochschwender's transfer because Jordan never informed him of the Poe incident. And if Jordan's testimony is credited, then Ryan ordered Hochschwender's transfer but only after Jordan informed him, in writing and following a thorough investigation, that Hochschwender acted inadvertently. Under that scenario, Ryan would have been entitled to rely on Jordan's formal findings, a conclusion that is not altered by Jordan's later misgivings about Hochschwender's innocence. Jordan himself admits that he "had no reason to believe"

---

[32] At least one case has suggested that if state actors have minutes or hours to deliberate, an intermediate standard of fault applies. *Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008).

that Hochschwender posed an ongoing threat to students so his report that it was "too risky" to leave Hochschwender in the classroom would not have enabled Ryan to take disciplinary action against a tenure-protected union teacher like Hochschwender. And Ryan can be forgiven for downplaying Jordan's purported demand that Hochschwender be removed from the building since, as Karcher, the union representative recalls, Jordan also called for the ouster of "a lot of other teachers" who had not been accused of inappropriate contact.[33] Ex. AA at 63:8–9. In this context, Jordan's vague and unsubstantiated concerns about Hochschwender may have given Ryan pause, but if communicated they would not have given him clear notice that Hochschwender posed a substantial risk of serious harm to his students. Thus, even crediting Jordan's testimony, Ryan could not have acted with deliberate indifference by reassigning Hochschwender to second grade. The claim against Ryan therefore fails.

Plaintiffs' claim against Jordan, however, may proceed. As noted in the previous section, in the light most damning to Jordan and most favorable to Plaintiffs, the testimony of Bristow and Mosakowski suggests that Jordan utterly failed to investigate a pattern of abuse allegations against Hochschwender and failed to communicate the substance of those allegations to any other responsible administrators. On this reading, Jordan acted with deliberate indifference because he disregarded the obvious risk that the allegations were true and that Hochschwender was, in fact, a child molester. If so, then Jordan's subsequent decision to transfer Hochschwender to second grade with no investigation whatsoever could demonstrate callous disregard to the risk that Hochschwender would continue to abuse his students. Admittedly, Plaintiffs' case is fragile, because it requires the jury to accept Jordan's testimony regarding the

---

[33] Karcher says that in Jordan's less-than-two-year tenure as Darby's principal, Jordan also demanded the removal of the art teacher, the music teacher ("the two of them were like oil and water"), the librarian, and "probably . . . Bristow." Ex. AA at 63:14–24.

multiple accusations against Hochschwender, while rejecting his testimony regarding his response to those accusations, which is starkly controverted by Ryan, Mosakowski, and Bristow). But it is a jury's prerogative to make such a choice. *United States v. Salahuddin*, 765 F.3d 329, 347 (3d Cir. 2014); *see also* Third Circuit Model Civil Jury Instruction 1.7— Credibility of Witnesses (updated March 2017). Plaintiffs have therefore sufficiently established the second element of their claim as to Jordan.

### iii. *Foreseeable and Fairly Direct Connection Between Action and Harm*

A harm is foreseeable when a state actor has "an awareness . . . that rises to the level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actor[] on notice of the harm." *L.R.*, 836 F.3d at 245. An action has a fairly direct connection to a harm when that action "precipitated or w[as] the catalyst for the harm." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir. 1997).

The foreseeability analysis largely flows from the earlier discussion of culpability. If Jordan knew of a pattern of abuse allegations against Hochschwender and had no basis to disbelieve those allegations because he never investigated them, then he could have foreseen that Hochschwender would molest his future students. Ryan, on the other hand, either knew nothing of the allegations against Hochschwender (his testimony) or, alternatively, knew of allegations but also knew that Hochschwender had been cleared following a formal investigation (Jordan's testimony). Either way, Ryan did not have sufficiently concrete notice of the risk that Hochschwender posed to his children.

Whether there was a fairly direct connection between Hochschwender's transfer and his subsequent abuse of second grade students is a closer question. Act and harm in this case were separated by two or three years. As noted above, no decision supports Ryan's argument that this

time lag precludes a finding of causation. But at least one Third Circuit decision (not cited by Defendants) suggests that tight temporal proximity might be necessary to establish a fairly direct connection between act and harm, and should be addressed.

In *Henry v. City of Erie*, 728 F.3d 275, 285 (3d Cir. 2013), the Third Circuit refused to impose liability on a local housing agency that had wrongly issued a Section 8 license and subsidy for an apartment that was not in compliance with applicable fire codes. The apartment later caught fire, killing the occupant and her guest, and the decedents' families sued the agency and its personnel on a state-create danger theory. In reversing the district court's denial of a motion to dismiss, the Court of Appeals noted that the plaintiffs had not shown that act and harm were directly connected in part because the issuance of the license and the fatal fire were not "close in time and succession" and, in fact, were separated "by a lengthy period of time and intervening forces and actions." *Id.*

Although *Henry* shows that temporal proximity is relevant to the directness inquiry, I do not read it to foreclose liability here. Notwithstanding the language quoted above, *Henry*'s outcome was based not on timing, but on the existence of intervening causes; namely, contributory negligence on the part of the apartment owner and the occupant herself, both of whom failed to remedy the code violations despite having actual notice of the need for repairs. Indeed, the lag between action and harm figured into the decision only to the extent that it created the opportunity for the occupant to mitigate the risk of fire. As the court explained, because "there was substantial time to reflect on the living situation," the defendants "did not throw [the occupant] into a snake pit, with all the urgency that such a situation would entail." *Id.* (citations omitted). Moreover, *Henry* was an unusual case in which the plaintiffs sought to

impose state-created danger liability on a licensor. In disposing of the plaintiffs' claim, the panel stressed its reluctance to extend the doctrine in this way.[34]

This case is distinguishable from *Henry*, both because it involves no attempt to extend state-created danger doctrine to a new class of state actors and, more importantly, because Defendants identify no intervening causes between Hochschwender's transfer and his abuse of his students. Unlike the apartment occupant in *Henry*, Hochschwender's second grade students cannot be faulted for failing to guard against the risk of molestation. And while the harm in Henry was ascribable at least in part to the apartment owner's failure to repair a known defect, if Jordan in fact failed to communicate the substance of the allegations against Hochschwender, then no one else at the District had a similar opportunity to intervene. On these facts, the temporal gap between Hochschwender's transfer and the subsequent harm to his students weighs against, but does not defeat, Plaintiffs' claim. If Jordan placed a teacher he had reason to suspect of child molestation in a second grade classroom, two school years without reports of abuse would not absolve him of responsibility for his action.

### iv. *Discrete Class of Victims*

Finally, Plaintiffs must establish that Roe and the three Does were "member[s] of a discrete class of persons subjected to the potential harm brought about by" Hochschwender's transfer, "as opposed to . . . member[s] of the public in general." *Bright*, 443 F.3d at 281. This element is easily satisfied here. All four children were second grade students at Darby, a group uniquely vulnerable to Hochschwender's predations because of his transfer to teach second grade.

---

[34] The court in *Henry* emphasized that "[t]he Supreme Court has counseled a restrained approach in the area of substantive due process," generally, and that the state-created danger doctrine was a "narrow exception to the general rule that the state has no duty to protect its citizens from private harms." *Id.* at 286.

In sum, Plaintiffs have satisfied the elements of a state-created danger claim against Jordan. Their claim against Ryan fails, however, because they have neither shown that Ryan acted with deliberate indifference by transferring Hochschwender to second grade, nor that the harm to A. Roe and the three L. Doe plaintiffs was foreseeable to Ryan at the time of that transfer.

### c. Qualified Immunity

Jordan next invokes the doctrine of qualified immunity, which shields government employees from personal liability unless their conduct violates "clearly established statutory or constitutional rights . . . which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because the facts show a violation of Plaintiffs' substantive due process right to bodily integrity, I must ask whether "it would be clear to a reasonable [school official]" that Jordan's conduct was unlawful under the circumstances of this case. *Reedy v. Evanson*, 615 F.3d 197 at 224 (3d Cir. 2010). If so, then Jordan is not entitled to qualified immunity.

The parties agree that the touchstone for qualified immunity analysis in this case is *Stoneking v. Bradford Area School District*, 882 F.2d 720 (3d Cir. 1989). There, the Third Circuit held that students have "a clearly established constitutional right . . . to be free from sexual abuse by teachers," and that school officials who communicate "toleration, condonation or encouragement" of abusive behavior are not entitled to qualified immunity. *Id.* at 731. The court was careful, however, to distinguish between affirmative actions that "encourag[ed] a climate to flourish where innocent girls were victimized," and the "mere failure of supervisory officials to act or investigate," which "cannot be the basis of liability." *Id.* at 730.

Under *Stoneking*, then, the central question on qualified immunity is whether Jordan's affirmative act—the transfer of Hochschwender to second grade—signaled "toleration, condonation or encouragement" of inappropriate contact with students. Unfortunately, neither party provides much of an answer. Plaintiffs' expert states in conclusory fashion that second graders are "even more vulnerable" to abuse than fifth graders. No. 15-2369, Dkt. 82-1 at 26. And Jordan, who bears the burden of proving entitlement to qualified immunity, *Reedy*, 615 F.3d at 223, merely asserts without elaboration that "there was no testimony . . . that [his] action . . . could be construed as any sort of approval." Jordan MSJ at 19. Nevertheless, I conclude that Hochschwender's transfer to second grade facilitated his subsequent misconduct, for two reasons. First, because it is more common and socially acceptable for adults to make physical contact with pre-pubescent children than with adolescents, a second grade teacher who touches his students is less likely to raise suspicions than a fifth grade teacher who engages in the same behavior.[35] Second, and relatedly, young children with less developed conceptions of personal space are less likely than adolescents to react defensively when touched by a trusted adult. Thus, a teacher who makes uninvited contact with a second grader runs a reduced risk of complaint, compared with a teacher who makes similar contact with a fifth grader. Because of these inherent differences between seven- and eight-year-olds on the one hand, and ten-and eleven-year-olds on the other, I find that Hochschwender's reassignment in the wake of the Poe incident communicated encouragement, condonation, or toleration his behavior. I therefore conclude that Jordan is not entitled to qualified immunity to the extent that he was behind that transfer.

---

[35] Adolescence is a "period of development corresponds roughly to the period between the ages of 10 and 19 years." National Institutes of Health, *Age Limits and Adolescents* (2003). This definition encompasses fifth grade students, who are typically 10 or 11 years old.

Accordingly, summary judgment will be denied as to the state-created danger claim against Jordan.

## B. Title IX Claims

Finally, Plaintiffs argue that the District violated Title IX, 20 U.S.C. §1681(a), which forbids discrimination at educational institutions on the basis of sex, and allows recovery by victims of physical sexual abuse. Whereas Plaintiffs' *Monell* claims require a policy or custom on the part of the District, Title IX's scheme of statutory liability imposes no such requirement and, in that regard, sweeps more broadly than § 1983. To hold the District liable, Plaintiffs need only show that (1) an appropriate person at the school (2) had actual knowledge of facts indicating a substantial danger to students and (3) acted with deliberate indifference to that danger. *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 361 (3d Cir. 2005).

An "appropriate person" is someone with "authority to address the alleged [abuse] and to institute corrective measures on the district's behalf." *Bostic*, 418 F.3d at 360 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). Thus, "a school principal who is entrusted with the responsibility and authority normally associated with that position will ordinarily be an appropriate person under Title IX." *Warren ex rel. Good v. Reading School District*, 278 F.3d 163, 171–72 (3d Cir. 2002).

As to the B.F. incident, there can be no question that Dunwoody, as principal, and her superior, Superintendent Trudy Bennett, were "appropriate persons" under Title IX. Regarding the Poe incident, the same can be said, as to the Poe incident, about Butz, who was then superintendent, Ryan, who was then assistant superintendent, and Jordan, who was then principal. Plaintiffs further argue that sufficient knowledge on the part of Bristow, the guidance counselor, can create Title IX liability. In *Warren*, however, the Third Circuit concluded that

even a guidance counselor who had sometimes assumed the duties of the principal when the principal was away was not "cloaked with sufficient authority" to be an "appropriate person" when the principal was present, 278 F.3d at 173, and Plaintiffs here have provided no evidence that Bristow had administrative authority over teachers. Though testimony suggests that Bristow questioned both B.F. and Poe about Hochschwender, it appears that her questioning was directed and supervised by Dunwoody (in the case of B.F.) and Jordan (with Poe)—and that it was Dunwoody and Jordan who decided how the District should respond to these allegations. Put differently, there is no evidence to suggest that Bristow ever assumed the duties of the principal or was otherwise vested with administrative control over the teaching faculty. Accordingly, I conclude that knowledge on her part would not suffice to create liability under Title IX.

The harder question is whether Plaintiffs can meet Title IX's exacting culpability requirement, which limits liability to those cases "where a [school] intentionally violates the statute." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). To show intent, Title IX plaintiffs must show that an appropriate person was personally aware of facts demonstrating a real danger to his or her student body—and that he or she made "an official decision . . . not to remedy the violation." *Id.* Precedent is imprecise about exactly how *much* an appropriate person must know in order to satisfy the actual knowledge prong of the test. *Gebser* makes clear that "actual notice requires more than a simple report of inappropriate conduct by a teacher." *Bennett v. Pa. Hosp. Sch. of Nurse Anesthesia*, No. Civ.A. 01-CV-4098, 2002 WL 32341792 (E.D. Pa. Oct. 29, 2002) (quoting *Vaird v. Sch. Dist. of Philadelphia*, No. Civ. A. 99-2727, 2000 WL 576441, at *3 (E.D. Pa. May 12, 2000); *see also Swanger v. Warrior Run Sch. Dist., 137 F. Supp. 3d 737, 751 (M.D. Pa. 2015), vacated and remanded, 659 F. App'x 120 (3d Cir. 2016).* To prevail, a plaintiff must prove an appropriate person knew of acts sufficiently

indicating a danger of future abuse.[36] *Davis*, 526 U.S. at 643. *Bostic* further clarifies that the known acts must show more than a mere *possibility* of abuse. 418 F.3d at 361. At the same time, because the standard is couched in terms of "danger," it necessarily contemplates liability where school officials suspect, but cannot be sure of, abusive conduct.

As with *Monell*, the governing standard is deliberate indifference, the evaluation of which requires that I "examine the apparent gravity of the risk." *Sanford*, 456 F.3d at 311. On this record, there is no viable path to liability under Title IX as to the B.F. incident. The conduct in question—a single instance of Hochschwender briefly placing a student's hands in his lap—would not supply actual knowledge of substantial danger to students. Even beyond that, Plaintiffs have presented no evidence that Bennett ever knew of any complaint regarding Hochschwender at any time, so liability cannot stem from her actions. Dunwoody was involved in the investigation, but given the ambiguous nature of the conduct, her independent assessment of Hochschwender's personal interactions with others generally, and B.F.'s history of making then recanting allegations, she can hardly be said to have shown indifference to student safety.

In contrast, as to the Poe incident, a path to liability exists, one that closely tracks the analysis of Plaintiffs' state-created danger claim against Jordan, the difference being that here, it is the District itself that is potentially liable, because knowledge attributable to Jordan flows back to the District by virtue of Jordan's status as an "appropriate person." Viewing the evidence in the light most favorable to Plaintiffs, this was not an isolated incident of a teacher patting a student on the bottom—but a series of girls in early adolescence being similarly touched. Context matters. The reported conduct did not publicly occur on the soccer field as a coach sent

---

[36] In *Bostic,* the Court of Appeals upheld a jury charge instructing that the plaintiff must show "sufficiently substantial danger to students." 418 F.3d at 361.

a player into a game, but behind the doors of the classroom.  Such contact between a male teacher and fifth-grade girls is in and of itself inappropriate, and the potentially sexual nature of such contact is self-evident.  By Jordan's admission, he had knowledge of such acts, and in my view, such conduct would reflect a substantial danger to students.

As discussed above, two divergent fact patterns exist:  either Jordan's entire testimony is deemed credible, and he both recognized the danger *and* conducted a full investigation into Poe's allegations, or Mosakowski and Bristow are deemed credible, and *no* such investigation occurred.  Jordan's version of events yields no Title IX liability, because while he (and perhaps Ryan and Mosakowski) might have had actual knowledge of Hochschwender inappropriately touching multiple students, he (and they) took steps to evaluate the danger.  Mosakowski's and Bristow's testimony, however, *could* result in Title IX liability, because if believed, Jordan did nothing in spite of knowledge of the danger.  For this reason, summary judgment as to the Title IX claims brought by Roe and the three Doe Plaintiffs must be denied.

As to Poe's claim, the facts are obviously different.  Jordan did not know of any allegations against Hochschwender until Poe's complaint, so he could not have acted with deliberate indifference to her safety.  And no other appropriate person knew facts sufficient to satisfy *Bostic*'s actual knowledge prong.  Until Poe's father allegedly complained of inappropriate touching of Poe and her peers, no appropriate person had knowledge that would support a Title IX claim.  Accordingly, summary judgment will be granted on Poe's claim.

This is an instance where Title IX allows for broader recovery than § 1983.  Though the actions of an individual administrator cannot bind a school district under *Monell*, they can under Title IX, provided that the administrator was deliberately indifferent to a danger of which he was

aware.  Because of that crucial difference, the claims of the Plaintiffs other than Poe may proceed.

**IV. Conclusion**

Defendants' motion for summary judgment will be granted as to Plaintiffs' § 1983 claims against the District.  Summary judgment will also be granted as to Plaintiffs' state-created danger claims against Ryan and Plaintiff Poe's Title IX claim against the District.  Summary judgment will be denied as to the state-created danger claim against Defendant Jordan, and the remaining Title IX claims against the District.  An appropriate order follows.


<u>        /s/ Gerald Austin McHugh</u>
United States District Judge